UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CONSOLIDATED ACTION

CASE NO. 20-CIV-61629-WPD

GREAT LAKES INSURANCE SE,

      Plaintiff,

v.

SUNSET WATERSPORTS, INC.,

      Defendant.
_____/

CASE NO. 20-CIV-61630-WPD

GREAT LAKES INSURANCE SE and
CERTAIN UNDERWRITERS AT LLOYD'S
OF LONDON SUBSCRIBING TO POLICY
NO. B0507RN2000289,

      Plaintiffs,

v.

SUNSET WATERSPORTS, INC., SUNSET
PARTY CAT, INC., and ANDREW
SANTEIRO,

      Defendants.
_____/

## <u>ORDER ON MOTION FOR SUMMARY JUDGMENT</u>

THIS CAUSE is before the Court on Plaintiffs Great Lakes Insurance SE ("Great Lakes")

and Certain Underwriters at Lloyd's of London Subscribing to Policy No. B0507RN2000289

(Underwriters) (collectively, "Plaintiffs")'s Motion for Final Summary Judgment [DE 66] (the

"Motion"). The Court has considered the Motion [DE 66], Defendants' Responses in Opposition

[DE 77], Plaintiffs' Reply [DE 87], the statements of material facts [DEs 65, 78, 86], the

1

supplemental briefing [DEs 97, 101, 102], the exhibits and affidavits filed in the record, and is otherwise fully advised in the premises.

For the reasons stated herein, the Court grants Plaintiffs' Motion for Summary Judgment.

## I.    BACKGROUND[1]

### A.  The Applicable Policies and Claims

At all times material to this action, Sunset Watersports, Inc. and Sunset Party Cat, Inc. (collectively, the "Defendants") were wholly owned by Richard Welter. PSMF ¶ 1; DSMF ¶1. In addition to Sunset Watersports and Sunset Party Cat, Welter owned Sunset Boat Rentals & Tours, Inc., Sunset Island Party Operating Corp., Key West Snorkel, Inc. and Sunset Waverunner Tours, Inc.[2] PSMF ¶ 2; DSMF ¶ 2.

This consolidated action involves the validity and applicability of three insurance policies to various claims: the 2019-2020 policy Great Lakes issued to Sunset Watersports; the 2020-2021 policy Great Lakes issued to Sunset Watersports; and the 2020-2021 policy Great Lakes and Underwriters issued to Sunset Party Cat (collectively, the "Sunset Policies"). The claims underlying the instant action are summarized as follows:[3] On July 2, 2019, Debra Manderson sustained injuries while participating in a parasailing excursion on board the Parasail V, operated by Sunset Watersports, after her left foot slipped and twisted when she attempted to board the boat with the assistance of an employee (the "Manderson Claim"). PSMF ¶¶ 84-86; DSMF ¶¶ 84-86. On July 17, 2020, Nicholas Hayward and Azalea Silva were participating in a parasailing

---

[1] Plaintiffs' statement of material facts, Defendants' responsive statement of material facts and additional facts, and Plaintiffs' response to Defendants' additional material facts include various citations to portions of the record. Plaintiffs' statement of material facts [DE 65] is cited as "PSMF", Defendants' response [DE 78] thereto is cited as "DSMF", and Plaintiffs' response to Defendants' additional material facts [DE 86] is cited as "PRSMF." Any citations herein to the statements of facts should be construed as incorporating those citations to the record.
[2] Sunset Waverunner Tours, Inc. was voluntarily dissolved in 2015 and was never insured by Great Lakes or Underwriters. PSMF ¶ 3; DSMF ¶¶ 2-3, 5.
[3] The facts of each claim are more fully described in sections III.B.1., III.C., and III.D.

activity operated by Sunset Party Cat when they were seriously injured; both individuals later died from their injuries (the "Hayward/Silva Claim"). PSMF ¶¶ 98, 120-22; DSMF ¶¶ 98, 120-22. On the same day as the Hayward/Silva Claim, Sarah and Ryan Arroyo were aboard the Parasail V and witnessed Hayward and Silva go up in sail, after which they sustained both physical and mental injuries (the "Arroyo Claim"). PSMF ¶¶ 153-154.

## B. Underwriting the Sunset Policies

Prior to the insurance contract with Great Lakes, Defendants were insured through Navigators Insurance Company ("Navigators"), who wrote all insureds on one policy. PSMF ¶ 4; DSMF ¶ 4. However, Defendants wanted to change their policy structure so that each entity would be insured on its own policy. PSMF ¶ 5; DSMF ¶ 5. Defendants engaged a broker, Michael Fields, who in turn contacted Catie Brugman at Hull & Company, who in turn contacted Great Lakes and Underwriters' managing agent, Concept Special Risks; this chain constituted the flow of information regarding risk between Plaintiffs and Defendants. PSMF ¶¶ 6-10; DSMF ¶¶ 6-10. Mr. Fields represented to Ms. Brugman that "Mr. Welter is the oldest parasail operator in KW. He and his crews are HIGHLY experienced and trained in safe operation. As you can see, the parasail operation hasn't been loss free but INCIDENT FREE for 8+ years." PSMF ¶ 12; DSMF ¶ 12.

On April 18, 2016, Ms. Brugman wrote to the lead underwriter at Concept Special Risks, the managing general agent of Great Lakes and Underwriters, Tony Usher via email. PSMF ¶ 14; DSMF ¶ 14. Usher is the managing director of Concept Special Risks and underwrites marine insurance policies. PSMF ¶ 15; DSMF ¶ 15. Brugman requested Usher underwrite policies for three parasail boats. PSMF ¶¶ 16-17; DSMF ¶¶ 16-17. Parasailing is outside Great Lakes' usual risk appetite and Sunset Watersports was the only parasail risk Great Lakes have ever written.

3

PSMF ¶ 18; DSMF ¶ 18. Nevertheless, Brugman wrote Usher an email, requesting a proposal and attaching several documents, once of which included a First Flight application indicating "N/A" for prior loss runs for three prior years and indicating no claims for the past five years. PSMF ¶ 20; DSMF ¶¶ 20; 174; PRSMF ¶ 174. Brugman also attached Navigators loss runs indicating no incidents, claims, or losses other than a July 19, 2009 loss involving a customer suffering a heart attack while snorkeling. PSMF ¶¶ 21-22; DSMF ¶ 21-22. Brugman also attached a letter from Welter "confirm[ing] there have been no parasailing related losses during the 4/28/2015 – 4/28/2016 term." PSMF ¶ 24; DSMF ¶ 24. On June 10, 2016, Brugman sent a copy of the Defendants' Concept Application to Great Lakes. PSMF ¶ 27; DSMF ¶ 27. Where question 11 of the Concept Application asked "[h]ave you or any named operator been involved in a loss in the last 10 years (insured or not)?" the box was marked "no." [4] PSMF ¶ 28; DSMF ¶ 28. The same representation was made on the Sunset Party Cat Concept Application. PSMF ¶ 29; DSMF ¶ 29.

Great Lakes ultimately issued policies to each of the Sunset entities except Sunset Waverunner, and those policies would be renewed for the 2017-2018 policy year, 2018-2019 policy year, 2019-2020 policy year, and the 2020-2021 policy year. PSMF ¶ 33. In each of the renewal years, the Defendants signed an operator form indicating the operators had no losses. PSMF ¶ 34; DSMF ¶ 34. However, the parties dispute to what extent Great Lakes relied on this information. Plaintiffs assert Great Lakes and Underwriters relied on the original application and representations in each of the renewal years. PSMF ¶¶ 33, 35-36. Defendants assert that the record shows Great Lakes, Underwriters, and Concept Special Risks knew or should have known about the inherent risks associated with commercial watersports operations before agreeing to

---

[4] The Concept Application does not define the term "you" or "loss." DSMF ¶ 162; PRSMF ¶ 162.

insure Sunset and, specifically, knew about no less than four separate incidents before renewing the Policies effective April 2020. DSMF ¶¶ 33, 35.

The complete Navigators loss runs showed Sunset Island Party and Sunset Party Cat made 12 claims to Navigators since 2011, resulting in $597,243.00 in expenditures by Navigators. PSMF ¶ 38; DSMF ¶ 38-39. The details of the claims indicated in the loss runs are more fully described in PSMF ¶¶ 39-48 and DSMF ¶¶ 39-48. Plaintiffs further contend that the Sunset entities were involved in at least nine other incidents not reported in the loss runs which are more fully described in PSMF ¶¶ 49-58 and DSMF ¶¶ 49-58. Defendants dispute many of these incidents and losses on the basis that the claims themselves were meritless, did not result in lawsuits, were "bogus" or "fabricated," or that Defendants otherwise do not recall the incidents. DSMF ¶¶ 46-49, 53, 55. However, it is undisputed that none of these incidents were disclosed to Great Lakes. PSMF ¶ 59; DSMF ¶ 59. Usher testified that had Great Lakes and Underwriters known about these incidents, they would not have written the risk. PSMF ¶¶ 66-67; DSMF ¶¶ 66-67.

**C. The Present Lawsuit**

This consolidated action is a declaratory judgment action that seeks to determine the rights of Defendants Sunset Watersports, Sunset Party Cat, and Andrew Santeiro[5] under marine insurance policies issued by Plaintiffs to Sunset Watersports and Sunset Party Cat. In its complaint with respect to the Manderson Claim, Great Lakes alleged the following causes of actions against Sunset Watersports: Count I—Breach of Warranty; Count II—Uberrimae Fidei; and Count III—Breach of General Condition L. *See* [DE 1]. In its complaint with respect to the

---

[5] Defendant Andrew Santeiro is an additional insured under the Sunset Watersports Policy and Party Cat Policy by virtue of him being scheduled as a Named Operator. To the extent that the Court determines the Policies are void from their inception or an applicable exclusion or warranty applies, the same applies to Santeiro.

Hayward/Silva Claim, Great Lakes and Underwriters alleged the following causes of action against Sunset Watersports and Sunset Party Cat: Count I—Breach of the Navigational Warranty (Sunset Policy); Count II—Uberrimae Fidei (Sunset Policy); Count III—Breach of General Condition L (Sunset Policy); Count V—Declaratory Judgment That the Loss Does not Fall Within the Coverage Grant (Party Cat Policy); Count VI—Violation of Exclusion K (Party Cat Policy); Count VII—Uberrimae Fidei (Party Cat Policy); Count VIII—Breach of General Condition L (Party Cat Policy); and Count IX—Declaration Regarding Number of Occurrences (In the Alternative).[6]

Plaintiffs bring the instant Motion for Summary Judgment, arguing that the Sunset Policies are void *ab initio* under the doctrine of *uberrimae fidei* or, alternatively, void under exclusions and warranties applicable to each of the claims.

## II.   <u>STANDARD OF LAW</u>

Under Rule 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears "the stringent burden of establishing the absence of a genuine issue of material fact." *Suave v. Lamberti*, 597 F. Supp. 2d 1312, 1315 (S.D. Fla. 2008) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

"A fact is material for the purposes of summary judgment only if it might affect the outcome of the suit under the governing law." *Kerr v. McDonald's Corp.*, 427 F.3d 947, 951 (11th Cir. 2005) (internal quotations omitted). Furthermore, "[a]n issue [of material fact] is not 'genuine' if it is unsupported by the evidence or is created by evidence that is 'merely colorable' or 'not significantly probative.'" *Flamingo S. Beach I Condo. Ass'n, Inc. v. Selective Ins. Co. of*

---

[6] The operative complaint in the Hayward/Silva Claim was subsequently amended by interlineation and Count IV was deleted. *See* [DE 76].

*Southeast*, 492 F. App'x 16, 26 (11th Cir. 2013) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986)). "A mere scintilla of evidence in support of the nonmoving party's position is insufficient to defeat a motion for summary judgment; there must be evidence from which a jury could reasonably find for the non-moving party." *Id.* at 26-27 (citing *Anderson*, 477 U.S. at 252). Accordingly, if the moving party shows "that, on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the nonmoving party" then "it is entitled to summary judgment unless the nonmoving party, in response, comes forward with significant, probative evidence demonstrating the existence of a triable issue of fact." *Rich v. Sec'y, Fla. Dept. of Corr.*, 716 F.3d 525, 530 (11th Cir. 2013) (citation omitted).

## III.   **DISCUSSION**

In moving for summary judgment, Plaintiffs put forth several reasons why the Court should find that there was no coverage under the Policies. The first is that the Policies are void under the doctrine of *uberrimae fidei* due to Defendants Sunset Watersports and Sunset Party Cat's failure to accurately disclose its loss histories during the 2019 and 2020 renewal process. The second is that, even if the Policies were not void from their inception under the doctrine of *uberrimae fidei*, there is no coverage for each of the claims based on the following: (1) with respect to the Hayward/Silva Claim under the Party Cat Policy, there is no coverage because parasail accidents do not fall within coverage and/or parasailing is specifically excluded from coverage; (2) with respect to the Manderson Claim, there is no coverage because Sunset Watersports violated warranties in the policy requiring Manderson to have signed a release; (3) with respect to the Hayward/Silva Claim and Arroyo Claim under the 2020-2021 Sunset Watersports Policy, there is no coverage because, at the time of both incidents, Sunset

Watersports was operating its vessel outside the policy's navigational limits; and (4) with respect to the Arroyo Claim under the 2020-2021 Sunset Watersports Policy, there is no coverage because the Arroyo Claim is part of the same occurrence and limit as the Hayward/Silva Claim.

As more fully described below, the Court finds as follows: Genuine issues of material fact preclude a determination that Plaintiffs are entitled to have the policy declared void under the doctrine of *uberrimae fidei*. Nonetheless, there is no coverage for each of the Claims under the Sunset Policies. First, with respect to the Hayward/Silva Claim under the 2020-2021 Sunset Party Cat Policy, there is no coverage because the parasail accident does not fall within coverage. Second, with respect to the Manderson Claim under the 2019-2020 Sunset Watersports Policy, there is no coverage because Sunset Watersports violated the release warranty in the Towers Endorsement. Third, with respect to the Hayward/Silva Claim and Arroyo Claim under the 2020-2021 Sunset Watersports Policy, there is no coverage because Sunset Watersports violated the navigational warranty at the time of both incidents, rendering the Policy void from inception.

### A. *Uberrimae Fidei*

"It is well-settled that the maritime doctrine of *uberrimae fidei* is the controlling law of this circuit." *HIH Marine Servs. v. Fraser,* 211 F.3d 1359, 1362 (11th Cir.2000). The doctrine of *uberrimae fidei*, or utmost good faith, requires an "insurance applicant [to] voluntarily and accurately disclose to the insurance company all facts which might have a bearing on the insurer's decision to accept or reject the risk." *Certain Underwriters at Lloyds, London v. Giroire*, 27 F. Supp. 2d 1306, 1311 (S.D. Fla. 1998). The duty extends to all facts which are material to the calculation of the insurance risk regardless of whether the insurer, underwriter, or application specifically inquires into them. *HIH Marine Servs.*, 211 F.3d at 1362. Under

Eleventh Circuit precedent, a fact is material if it could "possibly influence the mind of a prudent and intelligent insurer in determining whether he would accept the risk." *Kilpatrick Marine Piling* v. *Fireman's Fund Ins. Co.*, 795 F.2d 940, 942–43 (11th Cir. 1986) (stating that Eleventh Circuit believes the foregoing "to be a correct statement of law").

"[A]n insurer may void the policy even if the failure to disclose material facts was the result of actions by a person acting on behalf of the actual insured." *Great Lakes Reinsurance (UK) PLC v. Atl. Yacht & Marine Servs., Inc.*, No. 07-20295-CIV, 2008 WL 2277509, at *3 (S.D. Fla. Feb. 26, 2008) (citing *Underwriters at Lloyd's v. Giroire,* 1998 A.M.C. 2153 (S.D.Fla.1998); *Royal Insurance Co. Of America v. Cathy Daniels, Ltd.,* 684 F. Supp. 786 (S.D.N.Y.1986)).

1. *Whether* Uberrimae Fidei *Applies to Sunset Policies*

First, the parties dispute whether the maritime doctrine of *uberrimae fidei* applies to the Sunset Policies. Defendants argue that *uberrimae fidei* cannot and should not apply to the Sunset Policies because this case is about watersports tourism and the Eleventh Circuit has never applied *uberrimae fidei* in the marine commercial liability context. In response, Plaintiffs argue that *uberrimae fidei* applies to the Sunset Policies because the rule applies to marine insurance generally and, in any event, the carriers provide what is essentially marine hull coverage. Plaintiffs further contend that even if *uberrimae fidei* does not apply to the Policies, General Condition L of the Policies and New York state law[7] would lead to the same result. Therefore, as

---

[7] Although the parties dispute whether *uberrimae fidei* applies to the Policies, they do not dispute what choice of law applies. PSMF ¶ 151; DSMF ¶ 151.  Under federal maritime choice of law rules, a choice of law provision in a marine insurance policy will be applied unless the state in question has no substantial relationship to the parties or the transaction or the state's law conflicts with the fundamental purpose of maritime law. *See Great Lakes Reinsurance (UK), PLC v. Rosin*, 757 F. Supp. 2d 1244, 1250-51 (S.D. Fla. 2010). All three Sunset Policies contain the following choice of law clause: "It is hereby agreed that any dispute arising hereunder shall be adjudicated according to well-established, entrenched principles and precedents of substantive United States Federal Admiralty law and practice but where no such well-established, entrenched precedent exists, this insuring agreement is subject to the substantive laws of the State of New York." [DE 65-7] at p. 21; [DE 65-8] at p. 21; [DE 65-9] at p. 20.

an initial matter, the Court must determine whether *uberrimae fidei* applies to the Sunset Policies.

"Marine insurance contracts are governed by federal maritime law." *Quintero v. Geico Marine Insurance Company*, 983 F.3d 1264, 1270 (11th Cir. 2020). While the Admiralty Clause of the United States Constitution vests the federal courts with jurisdiction to hear maritime contract cases, "it does not follow . . . that every term in every maritime contract can only be controlled by some federally defined admiralty rule." *Wilburn Boat Co. v. Fireman's Fund Ins. Co.*, 348 U.S. 310, 313 (1955). In the absence of a judicially established federal admiralty rule, courts must rely on state law. *Quintero*, 983 F.3d at 1270. Although the doctrine of *uberrimae fidei* is "the controlling law of this circuit," *see HIH Marine Servs. v. Fraser,* 211 F.3d at 1362, the Eleventh Circuit has previously declined to articulate a standard for protection and indemnity policies. *Id.* at 1362, n.3 ("*Steelmet* raised the question of whether the general rule of *uberrimae fidei* applied to protective and indemnity polices as well as to hull policies. This court ultimately found it unnecessary to decide the issue. Because the coverage applicable to the defendants in this case was hull coverage only, however, there is no question that *uberrimae fidei* applies here.") (citing *Steelmet, Inc. v. Caribe Towing Corp.*, 747 F.2d 689, 695 (11th Cir. 1984)).

Defendants are correct in asserting that Eleventh Circuit has never applied *uberrimae fidei* to the protective and indemnity context, but Plaintiffs are similarly correct in contending that the Eleventh Circuit has also never explicitly precluded its application. The Eleventh Circuit has long recognized *uberrimae fidei* as an established maritime doctrine and has reaffirmed the vitality of its application time and time again. *See Steelmet*, 747 F.2d at 695 ("The general rule of marine insurance . . . is well settled in this circuit, and as a clear rule of maritime law it is the controlling federal rule even in the fact of contrary state authority."); *HIH Marine*, 211 F.3d at

1362; *AIG Centennial Ins. Co. v. O'Neill*, 782 F.3d 1296, 1302-03 (11th Cir. 2015). The Court

does not feel compelled to alter this course now, particularly where Defendants do not dispute

this Court's maritime jurisdiction.

Indeed, other circuits have extended the doctrine to vessel pollution insurance, a type of

liability insurance separate from hull coverage, because such policies protected against risks that

are marine in nature. *See Certain Underwriters at Lloyds, London v. Inlet Fisheries Inc.*, 518

F.3d 645, 654 (9th Cir. 2008) ("[V]essel pollution insurance fits well within the general

conception of marine insurance, as it is a contract of indemnity triggered by an event that is

maritime in character."); *see also Fireman's Fund Ins. Co. v. Great American Ins. Co. of New

York*, 822 F.3d 620, 637 (2d Cir. 2016) ("We conclude that the primary object of the Pollution

Policy's coverage of the dry dock was to insure against the risk of liability for pollutants emitted

during Signal's ship repair and maintenance operations there. Insurance policies protecting

against such risks have long been marine in nature."); *see also Folksamerica Reinsurance Co. v.

Clean Water of New York, Inc.*, 413 F.3d 307, 321 (2d Cir. 2005) (concluding the same).

The Policies in the instant case insure against the risk of liability associated with the

operation of Defendants' watersports businesses, a venture that is sufficiently marine in nature.

Defendants themselves acknowledge the Policies relate to "maritime commerce in the

watersports tourism arena." [DE 77], p. 5. That the vessels and associated risks insured involve

watersports activities does not alter their marine nature. Thus, the Court finds application of

*uberrimae fidei* to the Sunset Policies appropriate under these circumstances.

Defendants express concerns that adopting Plaintiffs' position would "set a dangerous

precedent" and "potentially chill maritime commerce in the watersports tourism arena."

However, such concerns appear overstated when considering that *uberrimae fidei* does not void

coverage unless the omissions or misrepresentations were material. Although minor incidents are often inevitable in the watersports tourism industry, it is unlikely that most incidents would meet the standard for materiality.

But even if the Court's application of *uberrimae fidei* to the Policies is misplaced, General Condition L of the Policies still warrants application of *uberrimae fidei* principles. General Condition L of the Policies states: "This contract is null and void in the event of non-disclosure or misrepresentation of a fact or circumstances material to our acceptance or continuance of this insurance. No action or inaction by us shall be deemed a waiver of this provision." [DE 65-7] at p. 18; [DE 65-8] at p. 55; [DE 65-9] at p. 16. Case law interpreting similar language guide this Court's analysis. For example, *in Quintero v. Geico Marine Insurance Co.*, the court held a general condition stating "[t]here is no coverage from the beginning of this policy if an 'insured' has omitted, concealed, misrepresented, sworn falsely, or committed fraud in reference to any material matter relating to this insurance before or after any loss" "mirrors the obligations imposed by *uberrimae fidei*." 389 F. Supp. 3d 1153, 1160 (S.D. Fla. 2019). Similarly, in *Northfield Ins. Co. v. Barlow*, the court determined that a clause rendering "insurance coverage null and void from its inception" if the applicant made "[a]ny misrepresentations" in the "application for insurance" served to "reinforce the principles" of *uberrimae fidei*. 983 F. Supp. 1376, 1380 (M.D. Fla. 1997).

Like the language in these cases, the language of General Condition L of the Sunset Policies sets forth a standard for voiding the contract consistent with the doctrine of *uberrimae fidei*. General Condition L declares the insurance contract null and void where "non-disclosure or misrepresentation" of a fact "material" to the underwriter's "acceptance or continuance" of the insurance. Indeed, "[t]his language embodies the core of the *uberrimae fidei* doctrine: that

omission or misrepresentation of a material fact is a sufficient ground, in and of itself, to allow an insurer to void a policy of marine insurance." *QBE Seguros v. Morales-Vazquez*, 986 F. 3d 1, 10 (1st Cir. 2021).

Further, unlike the cases where courts determined *uberrimae fidei* did not apply, the Sunset Policies impose no requirement that the misrepresentation be intentional. *Compare King v. Allstate Ins. Co.*, 806 F.2d 1537, 1539 (11th Cir. 1990) (ruling parties had contracted around maritime law and *uberrimae fidei* when policy became void if insured "intentionally" concealed or mispresented material facts) *with Quintero*, 389 F. Supp. 3d at 1160 (ruling the insurance contract reflected the doctrine of *uberrimae fidei* because it lacked the word "intent"). Additionally, New York state law, which governs the policies in the absence of federal admiralty law, recognizes the applicability of *uberrimae fidei* to "contracts and risks that are 'marine' in nature." *See In re Balfour MacLaine Int'l Ltd.*, 85 F.3d 68, 81 (2d Cir. 1996); *see also Am. Home Assur. Co. v. Masters' Ships Mgmt. S.A.*, No. 03 CIV. 0618 (JFK), 2004 WL 1161223, at *5 n.1 (S.D.N.Y. May 24, 2004) ("It is worth noting that the doctrine of utmost good faith would still apply were New York state law to be controlling because New York applies federal maritime law to all maritime cases. As such, the doctrine is an established part of New York case law."). As the Court previously discussed, the Policies here cover risks associated with watersports tourism and therefore appear sufficiently marine in nature. As such, whether the doctrine applies under federal maritime law or New York state law, the Court's application to the Sunset Policies is fundamentally the same.

Accordingly, the language in General Condition L of the Policies embodies the doctrine of *uberrimae fidei* and therefore principles of the same apply to the instant action as a matter of law. Of course, any omissions must be material for Plaintiffs to void the Sunset Policies. As

such, the Court must next determine whether Defendants' failure to disclose prior loss histories reaches the materiality threshold.

2. *Whether* Uberrimae Fidei *Voids the Policies*

Plaintiffs argue they are entitled to summary judgment because Defendants did not disclose that, in the ten years immediately preceding the inception of the Sunset Policies in April 2016, the Sunset entities sustained twenty losses. There is no genuine issue of fact regarding whether any of the twenty losses were disclosed to Great Lakes, though the parties do dispute whether the language on the Concept Application required Defendants to disclose such losses.[8] The relevant inquiry here turns on whether the omissions were material to the calculation of insurance risk. Based on the following analysis, the Court finds that there are genuine issues of fact as to whether these omissions were material.

Plaintiffs provide three bases on which it contends that the Court could find a prudent and intelligent insurer could possibly find Defendants' omissions material—the frequency of the losses, the severity of the losses, and the fact that the insured's agent would unilaterally determine when, if at all, to report losses. The twenty incidents described in Plaintiffs' statement of facts are, for the most part, undisputed. For purposes of efficiency, the Court summarizes some of the omissions identified as "more egregious" by Plaintiffs:

- An incident on March 10, 2011, in which a vessel owned by Sunset Island Party sank in inclement weather, for which Navigators paid $162,243;

- An incident on August 17, 2013, in which a crewmember sustained back injuries while working on a dock, for which Navigators paid $220,056;

---

[8] Defendants specifically point out ambiguities on the Concept Application regarding "you or any named operator" and "loss." However, the duty of utmost good faith applies to all facts which are material to the insurance risk, regardless of whether specifically inquired into. *HIH Marines Servs.*, 211 F.3d at 1362; *see also O'Neill*, 782 F.3d at 1304 (11th Cir. 2003) ("The federal maritime doctrine of *uberrimae fidei* . . . governs this dispute, and it provides no refuge in claiming ambiguity.").

- An incident on October 5, 2012, in which the insured's vessel struck a dinghy, for which Navigators paid $136,083;

- An incident on November 16, 2013, involving a banana boat collision and that resulted in litigation, for which Navigators paid $42,106; and

- An incident on April 18, 2014, involving a passenger who alleged injuries from being thrown from a kayak, for which Navigators paid $4,972.

PSMF ¶¶ 39, 42-43, 45-46; DSMF ¶¶ 39, 42-43, 45-46.[9]

The underwriter who issued the Policies and each of the renewals, Mr. Usher,[10] has testified that had he known about the twenty incidents, he would not have underwritten the risk. PSMF ¶¶ 66-67; DSMF ¶¶ 66-67. Moreover, the Defendants notified Mr. Fields of the July 5, 2016, July 8, 2016, August 1, 2016, and April 21, 2019 incidents, but Mr. Fields did not report the incidents to Hull & Company or Great Lakes. PSMF ¶¶ 70-71; DSMF ¶¶ 70-71. Mr. Usher testified that had Great Lakes and Underwriters known that Mr. Fields was deciding what claims or incidents to report, they would not have written the Sunset Policies. PSMF ¶ 73; DSMF ¶ 73.

Plaintiffs also point to the Underwriting Procedures, which state that underwriters "look for patterns where in certain circumstances there is a reasonably predictable outcome," and consider "past loss records on boats as well as on the land." PSMF ¶¶ 63-64; DSMF ¶¶ 63-64. The Underwriting Procedures further state an owner is probably uninsurable if there are more than three losses. PSMF ¶ 65; DSMF ¶ 65.

In their Response in Opposition, Defendants argue that the materiality of the omissions are genuinely disputed. Defendants contend that Mr. Usher's statements are merely subjective opinions regarding whether he would have underwritten the risk, not whether a reasonable insurer would. In response, Plaintiffs argue that Mr. Usher's testimony is enough to prove

---

[9] These incidents and others are more fully described in PSMF ¶¶ 39-58 and DSMF ¶¶ 39-58.
[10] Mr. Usher is the managing director of Concept Special Risks and has been underwriting marine insurance policies in the United States for approximately 30 years. PSMF ¶ 15; DSMF ¶ 15.

materiality and cite to certain cases where courts have found materiality met based on the testimony or affidavit of an underwriter.

The Court generally agrees with Plaintiffs that testimony of a carrier's underwriter *may* support a finding of materiality. However, at least two of the cases cited by Plaintiffs relied on the fact that the underwriter's testimony was unrebutted or uncontradicted. *See Certain Underwriters at Lloyds, London v. Giroire*, 27 F. Supp. 2d 1306, 1313 (S.D. Fla. 1998) ("To establish materiality, Lloyds provided the *unrebutted* affidavit of Mr. Burke A. Usher, an underwriter for Lloyds, in which Usher testifies that had Lloyds received a truthful 'yes' answer to the question whether the boat was used for racing, Lloyds would have declined coverage. In light of such *uncontradicted* evidence, the Court finds that the misrepresentation was material as a matter of law.") (emphasis added); *see also St. Paul Fire and Marine Ins. Co. v. Hailfax Trawlers, Inc.*. 495 F. Supp. 2d 232, 242 (D. Mass. 2007) (noting that the insured failed to "offer the testimony of any expert or insurance underwriter to rebut the statements of [the insurer's underwriter] that the prior incident would influence a reasonable underwriter's judgment"). Moreover, *AIG Centennial Ins. Co. v. O'Neill* was decided after a bench trial, and not at the summary judgment stage. 2013 WL 10450139.

The present case is distinguishable from the authority relied upon by Plaintiffs. Here, Defendants offer the testimony of their expert, Michael Fitzgerald,[11] to rebut Mr. Usher's testimony. Mr. Fitzgerald is a former underwriter with over 40 years of an experience as a marine broker and underwriter. DSMF ¶ 178; PRSMF ¶ 178. Mr. Fitzgerald opined that based on his experience and industry standards, a reasonable insurer would underwrite the Policies based

---

[11] Mr. Fitzgerald's opinion has also been separately challenged in Plaintiffs' *Daubert* Motion. *See* [DE 75]. On October 22, 2021, the Court denied the *Daubert* Motion on grounds that the considerations of ensuring only reliable testimony are less concerning at a bench trial. *See* [DE 96].

on a five-year loss history, as opposed to the nine plus years advocated by Plaintiffs. DSMF ¶ 181. Mr. Fitzgerald also opined that an underwriter considers an insured's overall loss ratio in deciding whether to accept or renew a risk. DSMF ¶ 185. He determined that, based upon review of Plaintiffs' "Chart of Incidents and Losses," a reasonable and prudent insurer would not consider the incidents material to the risk Plaintiffs seek to void. DSMF ¶ 186. Specifically, he found that the undisclosed incidents either: (1) occurred more than five years before the April 2016 acceptance of the risk; (2) occurred more than five years before the April 2020 renewal; (3) involved other entities or operators that were never insured by the carriers and do not have a connection to risks associated with parasailing; or (4) occurred after the policies were issued. DSMF ¶ 187.

While the Court acknowledges the contradictions and inconsistences identified by Plaintiffs in Mr. Fitzgerald's testimony and report, *see, e.g.*, PRSMF ¶¶ 181-82, 186-88, the Court is similarly skeptical of the testimony of Mr. Usher, who stated that he does not "really have the expertise to write this type of risk."  PSMF ¶¶ 16-17; DSMF ¶¶ 16-17. Viewing all evidence and factual inferences in Defendants' favor, the Court finds a genuine dispute as to whether the prior undisclosed losses were material. For example, genuine disputes exist as to whether losses related to the other Sunset entities would be considered by a reasonable underwriter. Genuine disputes also exist as to what frequency and severity of incidents an underwriter of watersports policies would consider material in an industry that, by its nature, inevitably involves more minor incidents.

Though the frequency and severity of the losses certainly *could* support the conclusion that an intelligent and reasonably prudent insurer would have found the representations material, materiality can be decided as a matter of law only "if reasonable minds could not differ on the

17

question." *O'Neill*, 782 F.3d at 1305 n.10. While the issue of materiality is a close one, Fitzgerald's testimony is sufficient to raise genuine issues of material fact as to whether the omitted information would be material.[12] Accordingly, the Court declines to grant summary judgment on this ground.

### B.  Whether There is Coverage for the Hayward/Silva Claim

The Court next turns to the question of coverage. Other than the doctrine of *uberrimae fidei*, Plaintiffs contend there is no coverage for the Hayward/Silva Claim because: (1) under the 2020-2021 Sunset Party Cat Policy, parasail accidents do not fall within coverage and are otherwise specifically excluded from coverage; and (2) under the 2020-2021 Sunset Watersports Policy, the carriers violated the navigational warranty by operating the Parasail V more than one mile offshore. For the reasons stated below, the Court finds no coverage for the Hayward/Silva Claim under both Policies.

### 1.  Coverage Under the 2020-2021 Sunset Party Cat Policy

As an initial matter, Defendants argue that a determination of Plaintiffs' duty to indemnify Sunset Party Cat is not ripe for adjudication until resolution of the underlying suit. The Court disagrees.

To ascertain whether the duty to defend has been triggered under New York law, a court will compare the allegations of the complaint to the insurance policy's terms. *See Burt Rigid Box, Inc. v. Travelers Prop. Cas. Corp.*, 302 F.3d 83, 97 (2d Cir. 2002). Where allegations in a complaint fall within the scope of the risks undertaken by the insurer, regardless of how false or

---

[12] The Court acknowledges Plaintiffs other arguments relating to *uberrimae fidei*, including the undisputed fact that the Defendants have not offered any expert testimony as to whether Defendants omissions were material to the 2019-2020 Sunset Watersports policy during the time in which the Manderson claim occurred. PSMF ¶¶ 75-76; DSMF ¶¶ 75-76. Nonetheless, because the Court finds the Claims are not covered for the reasons sated *infra*, it is unnecessary to address such arguments.

groundless those allegations might be, there is a duty to defend. *Century 21, Inc. v. Diamond State Ins. Co.*, 442 F.3d 79, 82 (2d Cir. 2006). To relieve the insurer of the duty to defend, there must be "no possible factual or legal basis on which an insurer's duty to indemnify under any provision of the policy could be held to attach." *Id.* at 82-83. Further, where "there is no duty to defend, there also is no corresponding duty to indemnify." *Ogden Corp. v. Travelers Indem. Co.*, 924 F.2d 39, 42 (2d Cir. 1991); *see also Atlantic Cas. Ins. Co. v. Value Waterproofing, Inc.*, 918 F. Supp. 2d 243, 261-62 (S.D.N.Y. 2013). Therefore, contrary to Defendants' assertions, the Court need not defer ruling on the duty to indemnify claims until the state court action has been resolved if, as a matter of law, it determines there is no duty to defend. The Court must therefore turn to the applicable policy language.

The 2020-2021 Sunset Party Cat Policy provides the following coverage for commercial passengers:

> Subject to our prior written agreement and your payment of an additional premium, we may at your request extend this insuring agreement to cover all sums which you become legally liable to pay and shall pay to fare paying passengers or passengers carried under charter as a result of your ownership or operation of the Scheduled Vessel.

PSMF ¶ 143; DSMF ¶ 143.

The facts of the tragic parasailing incident that is the subject of the Hayward/Silva Claim are not in dispute: On July 17, 2020, Nicholas Hayward and Azalea Silva were passengers aboard a vessel known as the "Party Cat," owned and operated by Sunset Party Cat. PSMF ¶¶ 98-99; DSMF ¶¶ 98-99. The Party Cat dropped anchor near Pearl Bank, and Hayward and Silva disembarked from the Party Cat and boarded the Parasail V. PSMF ¶¶ 100-01; DSMF ¶ 100-01. The Parasail V proceeded into the Northwest Channel and, in the near vicinity of channel marker no. 9, Hayward and Silva went up in the parasail. PSMF ¶¶ 103-04; DSMF ¶ 103-04. While

Hayward and Silva were up in the air and tethered to the Parasail V, the line tying them to the Parasail V snapped. PSMF ¶ 107; DSMF ¶ 107. Hayward and Silva fell and crashed into the water. PSMF ¶ 108; DSMF ¶ 108; *see also* [DE 89-1] at ¶ 26. Hayward was still alive when he was recovered from the water but was later pronounced dead. PSMF ¶¶ 120-21; DSMF ¶¶ 120-21. Silva suffered severe injuries and passed away on July 1, 2021, almost a year after the tragic incident. PSMF ¶ 122; DSMF ¶ 122; [DE 89-1] at ¶ 2. In the Fourth Amended Complaint in the underlying Hayward/Silva Claim, the Hayward and Silva estates bring claims for wrongful death negligence (Counts IV and IX) and joint venture (Counts V and X). *See* [DE 89-1].

Plaintiffs argue that the Hayward/Silva Claim is not covered by the 2020-2021 Party Cat Policy because Hayward and Silva's injuries were not the "result" of Sunset Party Cat's "ownership or operation" of the scheduled vessel. In response, Defendants argue there is a genuine dispute as to whether any liability that may result from the Hayward/Silva Claim would be a "result of" Sunset's operation of said vessel. It is undisputed that the vessel named the Party Cat was scheduled on the policy, but the Parasail V was not. DSMF ¶ 140; DSMF ¶ 140. Thus, the question is whether Hayward or Silva's injuries were "a result of" Sunset Party Cat's "ownership or operation" of the Party Cat.

The primary dispute among the parties is what "as a result of" means under New York law. Plaintiffs urge this Court to consider a three-part test under New York law applicable to automobile policies and adopted by at least one court in this district. The test provides that when determining whether a particular injury "results[s] from the ownership, maintenance or use of a covered auto," three factors must be met: (1) "[t]he accident must have arisen out of the inherent nature of the automobile"; (2) "[t]he accident must have arisen within the natural territorial limits of an automobile, and the actual use, loading, or unloading must not have been terminated"; and

(3) "[t]he automobile must not merely contribute to cause the condition which produces the injury, but must, itself produce the injury[.]" *U.S. Oil Ref. & Mtg. Corp. v. Aetna Cas. & Sur. Co.*, 581 N.Y.S. 2d 822, 823-24 (N.Y. App. Div. 1992). In other words, although the vehicle itself need not be the proximate cause of the injury, negligence in the use of the vehicle must be shown, and that negligence must be a cause of the injury. *Somers Cent. Dist. v. Lumbermens Mut. Cas. Co.*, 774 N.Y.S.2d 824, 825 (N.Y. App. Div. 2004).

Defendants dispute application of the test, contending that it covers auto policies and has never been applied by a New York state court in the maritime context. However, Defendants fail to make a persuasive case for any other standard applying New York law and instead rely on cases applying Florida law. For example, Defendants cite to *Travelers Prop. Cas. Co. of Am. v. Barkely* and *New Hampshire Ins. Co. v. Champion* to suggest that the Court adopt a broader reading of "as a result of." But both cases rely on the Florida Supreme Court's decision in *Taurus Holdings, Inc. v. U.S. Fid. And Guar. Co.*, 913 So. 2d 528 (Fla. 2005), a case that abrogated the three-part test for automobiles under Florida law. *See Travelers Prop. Cas. Co. of Am. v. Barkely*, No. 16-61768-CIV-ALTONAGA, 2017 WL 3593953 (S.D. Fla. Aug. 21 2017) (finding passenger's death occurred "'as a result' of the operation of the Vessel if his death originated from, grew out of, flowed from, was incident to, or had a connection with operation of the Vessel—constituting more than a mere coincidence") (citing *Taurus*, 913 So. 2d at 539); *see also New Hampshire Ins. Co. v. Champion*,  No. 6:12-cv-1832-Orl-22GJK, 2013 WL 12156445, at *6 (M.D. Fla. Nov. 25, 2013) ("Perhaps most importantly, the Florida Supreme Court held after *Race* that the phrase 'arising out of' in insurance contracts is 'unambiguous and should be interpreted broadly' to mean 'originating from, having its origin in, growing out of, flowing from, incident to, or having a connection with.'") (citing *Taurus*, 913 So. 2d at 539). As

Plaintiffs point out, no such abrogation exists under New York law and Defendants do not offer case law suggesting otherwise.

Without persuasive authority arising under New York law to the contrary, this Court "can see no principled or textual reason to treat the insuring provision of an automobile policy differently than a virtually identical insuring provision of a vessel policy." *See Boat Rental Miami, Inc.*, 2020 WL 2300090 at *6.  Thus, the Court finds the test appropriate to guide the analysis on this issue.

Applying the test, Plaintiffs argue that Hayward and Silva's injuries do not meet any of the three prongs. First, Plaintiffs contend that Hayward and Silva's injuries did not arise out of the inherent nature of the Party Cat because they were not injured on the Party Cat. Second, Plaintiffs assert that Hayward and Silva's injuries did not arise within the natural territorial limits of the Party Cat, as those injuries occurred when Hayward and Silva were more than four nautical miles away from the Party Cat. Finally, Plaintiffs assert that the Party Cat itself did not produce Hayward or Silva's injuries and is, at most, a but-for cause of Hayward and Silva's injuries.

In addition to contesting the use of the three-prong test, Defendants argue that even under the test from *U.S. Oil*, an accident need not occur on the insured vehicle so long as the accident is "the result of some act or omission related to the use of the vehicle." *See Eagles Ins. Co. v. Butts*, 269 A.D.2d 558, 558 (N.Y. App. Div. 2000). In response, Plaintiffs argue that *Eagles Ins. Co. v. Butts* counsels against Defendants' position. The Court agrees.

In *Eagles Ins. Co. v. Butts*, the plaintiff in the underlying action was leading a horse from a van an attached ramp when the horse bucked, throwing the plaintiff to the ground. *Id.* at 558. The plaintiff alleged the accident was caused by the horse and van owner's negligent training of

the horse, and the automobile insurer denied coverage. *Id.* Applying New York law, the court determined that the owner's acts or omissions involved prior training of the horse, not that the owner "used the van negligently or that the condition of the van in any way contributed to the accident." *Id.* at 559. As such, the court found no coverage. *Id.*

Similarly, the operative complaint in the Hayward/Silva Claim makes no allegations regarding negligent use of the Party Cat itself, nor does it make allegations regarding how the condition of the Party Cat in some way contributed to Hayward and Silva's injuries. Defendants argue that the operative complaint alleges various theories as to how Sunset Party Cat caused or contributed to the Hayward/Silva accident: by failing to "warn passengers of the dangerous weather and risks they would encounter" and by failing to "turn back, limit, or terminate any of the excursions" in light of dangerous weather conditions. [DE 89-1] at ¶¶ 23, 51. But these allegations do not relate to the ownership or operation of the Party Cat nor do they demonstrate that the Party Cat did "not merely contribute to cause the condition which produces the injury, but . . . itself, produce[d] the injury." *See Boat Rental Miami*, 2020 WL 2300090, at *5-6. Rather, these allegations appear to relate to Sunset Party Cat *the entity*'s involvement in the negligence that occurred aboard the Parasail V, not any negligence in the use of the Party Cat itself.

Further supporting Plaintiffs' arguments, it is undisputed that neither Hayward nor Silva was aboard the Party Cat at the time of the incident. PSMF ¶ 118; DSMF ¶ 118. The underlying complaint plainly alleges that Hayward and Silva were transferred onto another vessel operated by Sunset Watersports before the accident occurred. [DE 89-1] at ¶ 23. Although Sunset Party Cat's use of the Party Cat to transport Hayward and Silva to the Parasail V may have been a but-for cause of Hayward and Silva's injuries, the injuries neither arose from the intrinsic nature of the Party Cat nor did the Party Cat itself produce the injury. *See Boat Rental Miami*, 2020 WL

2300090, at *8 ("[W]hether Counter-Plaintiffs' ownership or operation of the boat was a 'but-for' cause of [the underlying plaintiff's] injury is not the relevant inquiry; rather, it is whether negligent use of the boat allegedly contributed to her injury."); *see also Matter of Manhattan & Bronx Surface Transit Operating Auth.*, 420 N.Y.S.2d 298, 299 (N.Y. App. Div. 1979).

In sum, the four corners of the underlying complaint in the Hayward/Silva Claim do not demonstrate Sunset Party Cat's negligent use of the Party Cat contributed to the accident. Therefore, the Hayward/Silva Claim was not a result of ownership or operation of the vessel under the Sunset Party Cat Policy, and Plaintiffs do not have a duty to defend Sunset Party Cat in the Hayward/Silva lawsuit. As such, they have no duty to indemnify Sunset Party Cat as to this claim. *See Atlantic Cas. Ins. Co.*, 918 F. Supp. 2d at 261-62. The Court therefore need not address whether the towing exclusion applies to bar coverage.

   2.   *Coverage Under the 2020-2021 Sunset Watersports Policy*

The Court next addresses whether there is coverage for the Hayward/Silva Claim under the 2020-2021 Sunset Watersports Policy.

The 2020-2021 Sunset Watersports Policy contains the following navigational warranty: "Warranted that each Scheduled Vessel is confined to Florida-not to exceed the offshore limits as stated on the attached schedule of vessels." PSMF ¶ 125; DSMF ¶ 125. The schedule of vessels on the Policy lists the offshore limits for all three parasail vessels insured by Great Lakes, including the Parasail V, as being "1 mile." PSMF ¶ 127; DSMF ¶ 127. The Policy further defines "navigational limits" as "all waters as limited and shown on the declaration page unless mutually agreed by us and amended in writing." PSMF ¶ 128; DSMF ¶ 128. The Policy's Claims Guidance clarifies that "[w]here we have advised a miles offshore limit this means that this is the farthest your vessel must be from land (within your defined navigation limits). For example,

24

Lake Michigan only—not to exceed 15 miles offshore." PSMF ¶ 129; DSMF ¶ 129. Critically, the Policy provides that "[w]here any term herein is referred to as a 'warranty' or where any reference is made herein to the word 'warranted', the term shall be deemed a warranty and regardless of whether the same expressly provides that any breach will void this insuring agreement from inception, it is hereby agreed that any such breach will void this policy from inception." PSMF ¶ 126; DSMF ¶ 126.

"[F]ederal maritime law requires 'strict' or absolute enforcement of express navigational warranties." *GEICO Marine Ins. Co. v. Shackleford*, 945 F.3d 1135, 1142 (11th Cir. 2019). In fact, "the breach of a navigation limit warranty bars coverage as a matter of maritime law even when the breach is unrelated to the loss." *Travelers Prop. Cas. Co. of Am. v. Ocean Reef Charters LLC*, 996 F.3d 1161, 1168 (11th Cir. 2021). Moreover, under New York law interpreting general rules of contract construction, breach of a marine insurance policy only suspends coverage during the period of non-compliance. *See Henjes v. Aetna Ins. Co.*, 132 F.2d 715, 718-19 (2d Cir. 1943). Nevertheless, an insurer may specify that any breach forfeits coverage if it explicitly and clearly indicates that such breach permanently ends coverage. *See Cunningham v. Ins. Co. of N. Am.*, 521 F. Supp. 2d 166, 169 (E.D.N.Y. 2006) (citing *Henjes*, 32 F.2d at 719); *see also Smith v. Nw. Fire & Marine Ins. Co.*, 246 N.Y. 349, 361, 159 N.E. 87, 91 (1927) ("[A] supervening breach shall do no more than suspend the obligation of the policy, and that the obligation shall revive when the defect has been corrected, unless indeed there is an express provision that the effect of any breach shall be to end the policy forever.").

Defendants do not argue that the one-mile navigational warranty is ambiguous. Nor do Defendants argue that ambiguity exists with regards to the language dictating that any breach of a warranty "will void this policy from inception." Considering this and upon careful review of

the Policy and relevant provisions, the Court finds that the unambiguous policy language requires that any breach of a warranty under the Policy, including the navigational warranty, voids the policy from its inception. Therefore, at issue is whether Sunset Watersports was more than one mile from land on the date of the incident. The Court finds that the answer to that question is yes.

Plaintiffs contend that the unrebutted evidence shows that the Hayward/Silva Claim occurred nowhere near land, and certainly not within a nautical mile of land. In support of this contention, Plaintiffs rely on the opinion of expert Captain Christopher Karentz.[13] Captain Karentz opined that the parasailing incident occurred more than one nautical mile[14] from the nearest shoreline, and that transit to the same location required piloting the vessel more than one nautical mile from the nearest shoreline. PSMF ¶¶ 105-06, 110-11. Captain Karentz further opined that the "partially submerged East Jetty of the Northwest Channel is not considered to be shoreline or land. The East Jetty is considered to be a danger or obstruction to navigation." PSMF ¶¶ 110-11. This interpretation is consistent with the Eleventh Circuit's interpretation of the purpose of navigational warranties: "[N]avigation warranties ensure that when 'little problems' arise on 'little vessels,' the masters will seek refuge close to shore where the vessels will be exposed to fewer risks than they would meet on the high seas." *Lexington Ins. Co. v. Cooke's Seafood*, 835 F.2d 1364, 1367 (11th Cir. 1988).

In a footnote in their response in opposition, Defendants contend that testimony of Captain Santeiro and Mr. Welter raise genuine factual issues regarding the navigational warranty

---

[13] Captain Karentz has been working as a Senior Marine Consultant for ten years and has over forty years of knowledge and experience in the marine industries. [DE 65-70] at p. 22.

[14] The policy does not define mile as an ordinary mile (5,280 feet) or a nautical mile (6,076 feet). Captain Karentz indicated that he used nautical miles (the greater distance) to evaluate the location of the Parasail V. *See* [DE 65-70] at p. 10.

that should be resolved at trial. Defendants, however, ultimately fail to raise a genuine dispute as to whether the East Jetty constitutes land or whether the subject vessel violated the one-mile navigational warranty on the day of the incident. Defendants dispute application of the navigational warranty based on Mr. Welter's testimony that the Hayward/Silva incident occurred "within a half a mile of the northwest jetty that sticks out at all times." DSMF ¶¶ 110-11. But neither Defendants nor Mr. Welter articulate what "land" means, and Mr. Welter admits that he does not know whether the East Jetty would be considered land. [DE 78-1], 178:19-179:10. This admission is further bolstered by the undisputed testimony of those working for Sunset Watersports, including Mr. Welter himself, who indicated that had Sunset Watersports known the navigational limit was only one mile, they would not have been operating in the Northwest Channel. PSMF ¶ 135; DSMF ¶ 135. Specifically, Mr. Welter testified:

> Q: So with a one-mile limit, could your guys have operated out in the tip of the northwest channel?
> A: No, they wouldn't have been there. If they stayed by land, yes, it's within a mile of land. But would they have been out there had they known it was a one mile? Absolutely not.

*Id.*

Furthermore, Defendants fail to support the contention that a jetty is land with any applicable case law or legal argument. "Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to put flesh on its bones." *McPherson v. Kelsey*, 125 F.3d 989, 995-996 (6th Cir. 1997)); *see also N.L.R.B. v. McClain of Georgia, Inc.*, 138 F.3d 1418, 1422 (11th Cir. 1998) ("Issues raised in a perfunctory manner, without supporting arguments and citation to authorities, are generally deemed to be waived.") (citing *Continental Tech. Serv., Inc. v. Rockwell Int'l Corp.*, 927 F.2d

1198, 1199 (11th Cir. 1991)). Without a substantive response, the Court finds this argument fails to raise a genuine issue of material fact as to whether Sunset Watersports was within one mile of "land" on the date of the incident.

Defendants also point to Captain Andrew Santeiro's testimony that he did not know the exact location of the Parasail V at the time of the incident. DSMF ¶¶ 109, 112, 115-17. Though this might raise a dispute regarding the exact location of the vessel, this testimony does not rebut Captain Karentz's finding that the East Jetty is located at such a point that Sunset Watersports would have had to violate the navigational warranty to get there. *See* [DE 65-70] at p. 19. Under the explicit terms of the policy, *any* breach voids the Policy from inception. Thus, regardless of whether the East Jetty constitutes "land" and regardless of whether Captain Santeiro knew the exact location of the Parasail V at the time of the incident, the unrebutted evidence leads to the same result. Given the essentially unrebutted findings of Captain Karentz, the Court finds that Sunset Watersports operated the Parasail V more than one mile offshore on the date of the Hayward/Silva Claim. Accordingly, because the undisputed evidence shows that Sunset Watersports breached the navigational warranty, the Policy is void as a matter of law.

Finally, because Defendants spend considerable time arguing against application of the navigational warranty under the doctrine of equitable estoppel, this argument merits discussion. Under New York law, "the doctrine of equitable estoppel can be applied to prevent an insurer from asserting valid defenses or exclusions to coverage." *Mattimore v. Patroon Fuels, Inc.*, 103 A.D.2d 981, 982 (N.Y. App. Div. 1984). The insured must show that he has been prejudiced by the insurer's actions and that he has relied on some conduct of the insurer to his detriment. *Id.*

In their response in opposition, Defendants argue that Plaintiffs are estopped from asserting no coverage on the basis of the navigational warranty because Defendants represented

that coverage would extend ten miles offshore. In support of this argument, Defendants point out that in early March 2020, Neil Burton, an underwriter for Concept Special Risks, emailed Catie Brugman at Hull & Company, attaching a quote for Sunset Watersports that provided "not to exceed 10 miles offshore" for the navigational warranty. DSMF ¶ 209. Defendants further contend that, over the next two months, as discussions over the quote continued, the ten-mile offshore limit was included in at least three separate versions of the quote. DSMF ¶¶ 131, 210, 213-15. In response, Plaintiffs argue that the quote erroneously contained a ten-mile navigational limit because of a mistake. PSMF ¶ 131; PRSMF ¶ 209. Nevertheless, it is undisputed that the one-mile navigational warranty was included in both the binder and final policy, which were provided to Mr. Fields prior to the Hayward/Silva incident. PSMF ¶ 132-33; DSMF ¶ 123-33. It is further undisputed that Mr. Fields was the Defendants' retail insurance agent. PSMF ¶ 68; DSMF ¶ 68.

As Plaintiffs point out, the general rule of New York insurance law is that estoppel cannot create coverage where none exists. *Downstairs Cabaret, Inc. v. Wesco Ins. Co.*, 187 A.D.3d 1642, 1643 (4th Dept. 2020); *see also QBE Americas, Inc. v. ACE Am. Ins. Co.*, 164 A.D. 3d 1136, 1139 (4th Dept. 2018) ("[A]s a general rule, estoppel cannot be used to create coverage where none exists and each insurer has the right . . . to rely upon the terms of its own contract with its insured.") (internal citations and quotations omitted). However, an exception exists where an insurer who undertakes to defend an insured "unreasonably delays in disclaiming coverage and the insured suffers prejudice as a result of that delay." *See James River Ins. Co. v. Power Mgmt., Inc.*, 55 F. Supp. 3d 446, 455 (E.D.N.Y. 2014) (quoting *Bluestein & Sander v Chi. Ins. Co.*, 276 F.3d 119, 122 (2d Cir. 2002)).

Here, Defendants do not argue Plaintiffs delayed in disclaiming coverage or that they have been prejudiced by such delay. Nor do Defendants cite to any cases applying estoppel to an insurance company's pre-policy conduct. Indeed, all the cases cited by Defendants refer to representations and conduct of the insurer that arose after the Policy was final, after the loss occurred, on grounds of the insurer's delay in disclaiming coverage. *See Frazier v. Royal Ins. Co. of Am.*, 110 F. Supp. 2d 110, 115-16 (N.D.N.Y. 2000) (applying the doctrine of equitable estoppel where the insurer unreasonably delayed in disclaiming coverage for over sixteen months after the subject incident); *Mattimore*, 103 A.D.2d at 982 (discussing whether actions taken by an insurance agent after the subject incident led the insured to believe the insurer would cover the loss); *Incorporated Village of Pleasantville v. Calvert Ins. Co.*, 204 A.D.2d 689, 690 (N.Y. App. Div. 1994) (finding that the insurance company's eight-month delay in disclaiming coverage was unreasonable as a matter of law); *K. Bell & Associates, Inc. v. Lloyd's Underwriters*, 827 F. Supp. 984, 988-89 (S.D.N.Y. 1993) ("[Plaintiff]'s complaint asserts that [the insurer] should be estopped from invoking a policy exclusion to deny coverage six and one-half years after the notice of claim was filed."). Absent an argument that Plaintiffs unreasonably disclaimed coverage, the Court does not feel compelled to craft a new exception to the general rule that estoppel cannot be used to create coverage where none exists.[15] Therefore, equitable estoppel does not bar Plaintiffs from relying on the navigation warranty to void the Policy.

Finally, regardless of whether Defendants ultimately read the Policy or whether Mr. Fields communicated the change in terms to Defendants, "[u]nder New York law, in the absence of fraud or other wrongful conduct, a party who signs a written contract is conclusively

---

[15] To the extent that Defendants are attempting to argue that Sunset Watersports was never notified of the change in terms and therefore could not agree to the terms, the result would no different. "[I]f there is no meeting of the minds on all essential terms, there is no contract." *See Prince of Peace, Enters., Inc. v. Top Quality Food Mkt., LLC*, 760 F. Supp. 2d 384, 397 (S.D.N.Y. 2011). And if there is no contract then there must certainly be no coverage.

presumed to know its contents and to assent to them, and he is therefore bound by its terms and conditions." *Progressive Cas. Ins. Co. v. C.A. Reaseguradora Nacional De Venezuela*, 991 F.2d 42, 46 (2d Cir. 1993). "This rule is applicable to insurance contracts as to contracts of any other kind." *Metzger v. Aetna Ins. Co.*, 125 N.E. 814, 816 (N.Y. 1920). It is undisputed that Mr. Fields was the Defendants' retail agent. PSMF ¶¶ 68-69; DSMF ¶¶ 68-69. Under New York insurance law and common law, "insurance brokers act as agents on behalf of the insured where they are employed by the insured to procure insurance." *Evvtex Co., Inc. v. Hartley Cooper Assocs. Ltd.*, 102 F.3d 1327, 1331-32 (2d Cir. 1996) (citation omitted). Although the Court acknowledges that Mr. Fields received the final Policy but never provided a copy of the Policy to Mr. Welter until after the Hayward/Silva incident, *see* PSMF ¶¶ 133-34; DSMF ¶¶ 133-34, these facts are insufficient to permit the Court to rewrite the insurance policy to create coverage.

In sum, because there is no coverage for the Hayward/Silva Claim because Sunset Watersports violated of the navigational warranty on the day of the incident, Plaintiffs have no duty to defend Sunset Watersports in the underlying suit. As such, Defendants have no duty to indemnify Sunset Watersports as to this claim. *See Atlantic Cas. Ins. Co.*, 918 F. Supp. 2d at 261-62.

### C.  Whether There is Coverage for the Manderson Claim

Other than the doctrine of *uberrimae fidei*, Plaintiffs contend there is no coverage for the Manderson Claim because Sunset Watersports violated warranties in the policy requiring Manderson to have signed a release.

The 2019-2020 Sunset Watersports Policy includes the following warranty in its Towers Endorsement: "Prior to allowing a participant to go aboard the watercraft(s) or to participate in an activity, each participant and/or passengers will be required to sign an Assumption and

Acknowledgement of Risks (hereafter 'Release') form provided by or approved by us." [DE 65-7] at p. 24. The Towers Endorsement further provides that "[f]ailure to comply with any one of the above warranties will render this policy null and void." *Id.*  The policy separately states that "all participants will sign a pre-approved release of liability, regardless of whether they are paying or complimentary and prior to the commencement of the charter, unless otherwise agreed by underwriters." *Id.* at 3.

The parties agree that New York law governs the interpretation of the applicable warranties. Under New York law, ambiguities are resolved in favor of the insured. *See Duane Reade, Inc. v. St. Paul Fire and Marine Ins. Co.*, 600 F.3d 190, 201 (2d Cir. 2010). However, if an insurance policy is "clear and unambiguous," it must be given its "plain and ordinary meaning." *Dalton v. Harleysville Worcester Mut. Ins. Co.*, 557 F.3d 88, 90 (2d Cir. 2009); *see also Mount Vernon Fire Ins. Co. v. Belize NY, Inc.*, 277 F.3d 232, 236 (2d Cir, 2002) ("The New York Approach to the interpretation of contracts of insurance is to give effect to the intent of the parties as expressed in the clear language of the contract."). "Language in an insurance contract will be deemed ambiguous if reasonable minds could differ as to the meaning." *Haber v. St. Paul Guardian Ins. Co.*, 137 F.3d 691, 695 (2d Cir. 1998).

The facts of the Manderson Claim are not in dispute:

> [O]n or about July 2, 2019, while the Parasail V was docked, Debra Manderson, with the assistance of the captain and mate on either side of her and her husband in front of her, sat down on the dock to ease her way down onto the boat. She then allegedly stepped down on the gunwale with her right foot and stepped down to the cushioned seat with her left foot with the assistance of both the captain and mater. Her left foot allegedly rolled over injuring her ankle.

PSMF ¶ 85; DSMF ¶ 85. It is also undisputed that Manderson never signed a liability waiver. PSMF ¶ 87; DSMF ¶ 87.

The Court finds that the Tower Endorsement unambiguously applies to the Manderson Claim. The Court reads the provision to require a passenger and/or participant to sign a release prior to the earlier of boarding the watercraft or participating in the activity. This reading makes sense when considering that the Towers Endorsement applies to many activities where boarding a watercraft is not required such as water skiing or knee boarding. Thus, the use of the word "or" sweeps in those situations in which boarding a watercraft does not apply. This straightforward interpretation also sweeps broadly to cover scenarios in which a passenger may board a watercraft but never actually participate in an activity. This reading is further supported by the undisputed testimony of the Captain and Mate for the Parasail V, Miles Hudson and Matt Bowman, who both testified that the release is supposed to be signed prior to passengers boarding the vessel on the dock. PSMF ¶ 93; DSMF ¶ 93.

Defendants argue that the use of the term "or" creates an ambiguity as to when and how many times a participant and/or passenger must sign a release waiver for coverage to exist. To the extent that Defendants are implying that Sunset Watersports may elect when to have participants sign releases, *either* prior to boarding *or* prior to participating in an activity, Manderson never signed a release at *any* time. Moreover, such a reading essentially reads the first part out of the warranty. Under Defendants' reading, a hypothetical scenario is possible where a passenger boards a parasailing vessel but never actually parasails. In such a situation, the passenger boarded a vessel but never signed a release, despite the requirement that a participant and/or passenger sign a release "[p]rior to . . . go[ing aboard the watercraft[]." The Court will not adopt such a constrained reading, particularly where, under New York law, "language must be read, where possible, to give meaning to each word." *Charter Oak Fire Ins. Co. v. Zurich Am. Ins. Co.*, 462 F. Supp. 3d 317, 329 (S.D.N.Y. 2020).

33

Accordingly, because Manderson never signed a release prior to boarding the Parasail V, and the policy warranted that a release be signed, the unambiguous language voids coverage for the Manderson Claim. As such, Defendants have no duty to indemnify Sunset Watersports as to this claim. *See Atlantic Cas. Ins. Co.*, 918 F. Supp. 2d at 261-62. The Court therefore need not address whether the release warranty on the declarations page applies.

**D. Whether There is Coverage for the Arroyo Claim**

Finally, Defendants contend there is no coverage for the Arroyo Claim under the 2020-2021 Sunset Watersports Policy because the carriers violated the navigational warranty. On the same day and time as the Hayward/Silva Claim, Sarah and Ryan Arroyo were aboard the Parasail V. PSMF ¶ 153; DSMF ¶ 153. In response to Sunset Watersports' Petition for Exoneration from or Limitation of Liability, the Arroyo's alleged the following:

> On or about July 17, 2020, SUNSET commenced the subject excursion notwithstanding severe weather, rough seas, dangerously high winds, and explicit warnings from other excursion guests. After SUNSET navigated the subject vessel away from shore, the SUNSET crew members launched two passengers on a parasail when suddenly and without warning, the vessel severely listed (tilted) for a prolonged period of time, and to such an extent that it did not immediately regain its upright position, causing Plaintiffs to fall and slide to one side of the subject vessel and sustain severe injuries. Shortly after the vessel stopped violently listing, the vessel severely listed again, causing Plaintiffs to fall onto the lower side of the subject vessel, and, as a result, Plaintiffs sustained bodily injury and mental anguish, including fear of capsizing or sinking, with physical manifestations of psychological injuries.

PSMF ¶ 154; DSMF ¶ 154.

As the Court explained in Section III.B.2., Sunset Watersports violated the navigational warranty on the date of the Hayward/Silva Claim and Arroyo Claim. Under the strict terms of the Policy regarding warranties, *see* PSMF ¶ 126; DSMF ¶ 126, this renders the 2020-2021 Sunset Watersports Policy void *ab initio*. *See supra*. Therefore, Defendants as a matter of law have no duty to defend Sunset Watersports in the underlying Arroyo Claim and therefore have no duty to

indemnify Sunset Watersports as to this claim. *See Atlantic Cas. Ins. Co.*, 918 F. Supp. 2d at 261-62.

Finally, Plaintiffs requested declaratory relief in the alternative as to the number of occurrences in the Hayward/Silva Claim and Arroyo Claim to the extent that coverage is found under the policies. As the Court has already determined that there is no coverage for either claim, the Court need not address the parties' arguments as to whether the number of occurrences is ripe for review.

## IV.   <u>CONCLUSION</u>

For the reasons explained above, Plaintiffs' motion for summary judgment is granted. First, there is no genuine issue of material fact that underlying allegations in the Hayward/Silva Claim are not covered by the 2020-2021 Sunset Party Cat Policy because the incident was not "a result of" Sunset Party Cat's ownership or operation of the Party Cat. Second, there is no genuine issue of material fact that the navigational warranty was violated on the day of the Hayward/Silva Claim, rendering the 2020-2021 Sunset Watersports Policy void from inception under the plain terms of the Policy. Finally, there is no genuine issue of material fact that there is no coverage for the Manderson Claim, as Sunset Watersports violated the unambiguous provision requiring a release be signed.

Accordingly, it is **ORDERED AND ADJUDGED** as follows:

1.   Defendants' Motion for Summary Judgment [DE 66] is **GRANTED** for the reasons stated herein.

2.   Pursuant to Fed. R. Civ. P. 58(a), the Court will enter a separate final judgment.

**DONE AND ORDERED** in Chambers at Fort Lauderdale, Broward County, Florida, this 8th day of November, 2021.

WILLIAM P. DIMITROULEAS
United States District Judge

Copies furnished to:

All Counsel of Record